******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# APPENDIX

## JAN GAWLIK *v.* SCOTT SEMPLE ET AL.*

Superior Court, Judicial District of New Haven
File No. CV-16-5036776-S

Memorandum filed September 4, 2018

*Proceedings*

Memorandum of decision in action alleging violation of plaintiff's rights to religious freedom. *Judgment for the defendants.*

*Jan Gawlik*, self-represented, the plaintiff.

*Steven R. Strom*, assistant attorney general, for the defendants.

*Opinion*

ECKER, J. This is an action for declaratory and injunctive relief brought by an inmate at the Cheshire Correctional Institution (Cheshire) against various prison officials and staff. The plaintiff, Jan Gawlik, claims that the defendants have violated his constitutional and statutory rights to religious freedom by refusing to deliver incoming mail containing blank religious "prayer cards" and matching envelopes, used religious books, and religious newspapers sent from a source other than the publisher. He seeks a declaratory judgment holding that his religious rights have been violated by the defendants' practices and policies governing delivery of these items, and an injunction requiring the Commissioner of Correction to delete those portions of the Department of Correction (department) administrative directives that prohibit the delivery of such items. He also seeks a judicial declaration that the administrative directives at issue were promulgated illegally because the department adopted them without complying with the procedural requirements of the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq.

A bench trial was held before the undersigned judge on January 25, 2017, January 31, 2017, and March 22, 2017. Extensive posttrial briefs were submitted by the parties.[1] For the reasons that follow, judgment is entered in favor of the defendants.

I

FINDING OF FACTS

The plaintiff, Jan Gawlik, is serving a sixty year sentence for murder. He is incarcerated at the Cheshire Correctional Institution, which houses approximately 1300 inmates. Gawlik describes himself as a devout Catholic. His family is from Poland. He speaks Polish and was raised as a "Polish Catholic." Gawlik has decided that he wants to become a Catholic priest and is engaged in a self directed course of study toward that end.[2] He also takes part in many religious practices and activities at Cheshire. He participates in daily mass services and also attends a collective weekly mass on Wednesdays. On Mondays, he attends a weekly Bible study class run by volunteers from the Legion of Mary. He attends a weekly confirmation class conducted by one of the prison chaplains, Deacon Robles. Gawlik also reads religious texts and books about religion; he has access to many religious books, including various Bibles and other texts, and keeps approximately fifteen (15) different religion related books in his cell. He also donates money from his prison account to outside religious organizations that aid poor, hungry, homeless, and/or disabled individuals.

The plaintiff's present lawsuit complains that his religious freedom, and other legal rights, are being violated

by department employees at Cheshire as a result of their refusal to deliver certain types of incoming mail to him. Four types of incoming mail are at issue. The first is used books. Three used books ordered by the plaintiff were rejected by department staff: (1) a used copy of the 1983 Code of Canon Law, promulgated by Pope John Paul II; (2) a book entitled The Book of Angels; and (3) a book entitled International Eucharistic Congress Pictorial Album.[3] See Plaintiff's Exhibits 22, 33, 36, 37, 38, 56, 56-A. All three books were purchased by the plaintiff from a company called Preserving Christian Publications, Inc. See Plaintiff's Exhibit 35 (company catalogue, August-September, 2016). All three books are religious in nature.

Upon delivery to the mail room at Cheshire, the books were rejected by department personnel under the authority of either or both of two provisions of department administrative directive 10.7 ("Inmate Communications"). The first directive, administrative directive 10.7 (4) (G) (1) ("Review, Inspection and Rejection"), includes the following general authorization to reject mail after the mandated inspection: "All incoming general correspondence may be rejected if such review discloses correspondence or material(s) which would reasonably jeopardize legitimate penological interests, including, but not limited to . . . (a) [preventing] the transport of contraband in or out of the facility . . . ." The second directive, administrative directive 10.7 (4) (N) ("Incoming Publications and Educational Materials"), states in relevant part: "An inmate may order books *in new condition only* from a publisher, book club, or book store."[4] (Emphasis added.) The department's underlying security concerns are discussed [in part II A of this opinion].

The second type of rejected material consists of newspapers mailed to Gawlik from outside sources other than the publisher. The newspapers included The Catholic Transcript, which is a publication of the Archdiocese of Hartford, Narod Polski, a bilingual publication of the Polish Roman Catholic Union of America, and various Polish language newspaper editions published by the New Britain Herald. See Plaintiff's Exhibit 6. The newspapers evidently were forwarded to the plaintiff by someone associated with Sts. Cyril and Methodius Church in Hartford and perhaps other sources; they were not mailed to the plaintiff directly from the publisher or a commercial vendor.[5] Department staff explained to the plaintiff at the time that the newspapers were rejected by department personnel on the ground that "magazines and newspapers [are] allowed only by subscription or if mailed directly from the bookstore/bookseller/vendor." Plaintiff's Exhibit 47 (rejection form, dated January 6, 2017).

The third type of rejected materials consists of large quantities of "blank" religious "prayer cards" and

matching envelopes sent to the plaintiff, free of charge, as a gesture of gratitude, by the churches, missions, and other religious organizations to which he has made monetary donations. Apparently, it is not unusual for these organizations to respond to a donation by sending a note of thanks, accompanied by a set of blank greeting cards of the type sold in stationery stores and gift shops. The cards typically are embossed with religious icons, symbols, prayers, biblical quotations, and the like. Matching envelopes are included. The idea is that the donor can use the cards to communicate religious messages to friends and loved ones on holidays and other occasions. The plaintiff wanted to use the cards for that purpose because he liked their religious messages, in contrast to what he called the "pagan" or "nonreligious" cards available from the prison commissary. Compare Plaintiff's Exhibit 4 (examples of "religious" prayer cards), with Plaintiff's Exhibit 5 (examples of "nonreligious" holiday cards). A combination of considerations under administrative directives 10.7 and 10.8 formed the basis of the department's rejection of these cards and envelopes. See [part II A of this opinion].

The fourth type of rejected mail includes religious and nonreligious greeting cards or homemade cards (relatively few in number) containing glitter, crayon, lipstick, or similar decorative materials. Some of these were holiday cards for Christmas or Easter sent by correspondents in Poland; one rejected item was a decorative drawing made by the plaintiff's goddaughter. These cards and other items were rejected by department staff, under the authority of administrative directive 10.7, based on concerns that illegal drugs, including a substance known as "suboxone," have been found in similar decorative features of incoming correspondence sent to other prison inmates, both at Cheshire and elsewhere. The department has no means by which to conduct drug testing on each piece of incoming mail with these decorative features. See [part II A of this opinion].

Before commencing the present lawsuit, the plaintiff filed numerous administrative grievances and appeals concerning the staff's refusal to deliver the used books, blank prayer cards and envelopes.[6] Administrative directive 9.6 sets forth procedures governing inmate requests for administrative relief from adverse decisions regarding various conditions of confinement, including everything from allegations of improper disciplinary action to the unjustified rejection of incoming mail. See Administrative Directive 9.6 (4) (A) through (M). The department's administrative review process varies somewhat depending on the subject matter at issue but, in general, begins with an attempt at informal resolution, moves to a procedure involving a formal written grievance by the inmate, and then provides for one or more sequential levels of review ascending the administrative hierarchy.

The principal target of the plaintiff's complaints was the defendant Simone Wislocki, a department employee who works as a "mail handler" at Cheshire. Mail handlers are responsible for reviewing and inspecting incoming mail to determine whether the incoming item will be delivered to the addressee inmate under applicable department policy, including administrative directive 10.7 (4) (G) ("Incoming General Correspondence") and administrative directive 10.7 (4) (N) ("Incoming Publications and Educational Materials"). The record reflects that Wislocki rejected the plaintiff's incoming mail containing blank prayer cards and envelopes on many occasions in 2015 and 2016. The plaintiff was made aware of the rejections when he received a department form entitled "Returned Letter or Funds Notification," which was completed by Wislocki in connection with some (but not all) of the rejected cards and envelopes. The three used books were rejected in 2016 and early 2017. The newspapers were rejected in early 2017.

Of the plaintiff's numerous administrative grievances and appeals relating to these rejections of incoming mail, some complaints focused on substantive issues involving the alleged violation of his religious freedom under federal and state law. See, e.g., Plaintiff's Exhibits 16, 17, 28, 36, 43, 45, 46, 46A, 48, 48-A. Other complaints were procedural in nature, and claimed, for example, that Wislocki was rejecting prayer cards without providing the plaintiff with notice of rejection required by administrative directives 10.7 (4) (G) (2) or 10.7 (4) (N) (3); see, e.g., Plaintiff's Exhibits 21A, 21B, 23-25, 29; or that the rejection/administrative review process in some other respect had not been conducted in accordance with applicable department policy. See, e.g., Plaintiff's Exhibits 37, 41, 56, 56-A. It does not appear that any of these administrative grievances or appeals was successful.

The record is replete with evidence that the plaintiff pursued certain avenues of administrative recourse, by filing grievances and appeals from denied grievances in connection with the mail handler's rejections of the used books, prayer cards/envelopes, and newspapers. The record is equally clear, however, that the plaintiff did not pursue other available means for obtaining relief.[7] Thus, with respect to prayer cards, for example, administrative directive 10.8 (5) (I) provides expressly that inmates may seek permission from the director of programs or treatment or that person's designee to purchase religious articles not available through the prison commissary.[8] Testimony at trial established that this recourse was available to the plaintiff but was not used by him as a way to obtain prayer cards or other items that he considered religiously appropriate. Likewise, evidence at trial established that the department allows inmates to obtain permission from designated department personnel to engage in "individual religious

practices," which is defined [to] include, without limitation, "access to religious publications." Administrative Directive 10.8 (5) (D). The procedure for obtaining permission under administrative directive 10.8 (5) (D) requires the inmate to submit a request to the correctional facility's director of religious services (Father Bruno, during the time in question at Cheshire), who is required to "consider whether there is a body of literature stating principles that support the practices and whether the practices are recognized by a group of persons who share common ethical, moral or intellectual views." Id. For security reasons, the directive also requires approval by the department's deputy commissioner of operations.[9] Again, the trial record shows that the plaintiff made no effort to obtain the desired items under administrative directive 10.8 (5) (D). Nor did he purchase a subscription to any of the newspapers that he wished to receive, despite having ample personal funds to do so. See Administrative Directive 10.7 (4) (N) (procedure for ordering subscriptions).

The court has paused to highlight the plaintiff's failure to pursue alternative means of redress because this evidence, though not essential to the judgment, reinforces the court's conclusion (based in large part on his own statements at trial) that the plaintiff was more interested in battling with the department over abstract principles than actually obtaining possession of the religious materials at issue. Rather than purchasing a newspaper subscription, or buying new religious books (presumably available in many thousands of titles through nationwide vendors),[10] or working through proper channels at Cheshire pursuant to administrative directive 10.8 to obtain a workable, pragmatic solution providing him access to the sought-after religious materials without creating a risk to prison security, the plaintiff viewed the situation as a personal battle between himself and a "malicious" mail handler (Wislocki), and he became fixated on vindicating his absolutist and incorrect view of his legal "rights."[11] It is clear from the plaintiff's administrative grievances and the testimony at trial that the plaintiff considered the rejections as part of a campaign waged by Wislocki against him personally, and believed that Wislocki was acting out of a combination of religious animus and personal antipathy.[12] See, e.g., Plaintiff's Exhibit 16 (containing various administrative filings by plaintiff accusing Wislocki of "superseding" order to deliver "religious media mail," accusing Wislocki of engaging in deliberate actions to purposely cause harm to plaintiff as a "malicious punitive measure," and "knowingly" violating his religious freedom); Plaintiff's Exhibit 24 (grievance accusing Wislocki of implementing "punitive measures" against plaintiff by rejecting mail); Plaintiff's Exhibit 45 (stating that Wislocki's disposition reflects "deliberate indifference" to his grievances); Plaintiff's Exhibit 46 (accusing mail room staff of "fabrication" and allowing "ego and

pride" to impair its performance); Plaintiff's Exhibit 58 (accusing Wislocki of "lying" with respect to basis for rejection).

The plaintiff filed this lawsuit in mid-2016. He seeks injunctive and declaratory relief of two kinds. First, he requests a judicial decree requiring the defendants to deliver to himself (and all other inmates) all "religious and nonreligious cards with factory glitter . . . all artwork, letters, sketches, drawings, anything artistic . . . any form of communication from adults and/or children, written or colored or drawn in colored pencil(s), crayons, markers, letters sent with a lipstick kiss . . . used books, donated books, used donation[s] from prison ministries, churches, envelopes with and without postage, newspapers donated from churches, prayer, photo books . . . flyers, bookmarks, pamphlets, and any or all donations . . . ." See Plaintiff's Posttrial Brief, dated May 22, 2017, at 53; see also Plaintiff's "Injunction," dated January 31, 2017 (seeking permanent injunction prohibiting department from rejecting plaintiff's "religious media mail, religious correspondence, all prayer cards, religious blank envelopes, religious pamphlets, religious literature, religious books, used and new, from publisher(s), bookstore(s), book clubs, libraries, religious stationery, religious notebook(s), religious posters, bookmark(s), religious Catholic denominational materials in all forms of correspondence from churches, missions, orphanages, organizations, etc., incoming and outgoing, ordered/sent to the plaintiff").

Second, the plaintiff seeks a declaratory judgment determining that the department's administrative directives applicable to inmate property (administrative directive 9.6), inmate correspondence (administrative directive 10.7) and religious services (administrative directive 10.8) are invalid because they were not promulgated as "regulations" pursuant to the UAPA. See, e.g., Plaintiff's "Declaratory Judgment," dated February 27, 2017.

As noted, a bench trial before the undersigned was held over the course of three days. The plaintiff personally appeared and represented himself in a capable and organized manner. He submitted voluminous exhibits, which were admitted into evidence without objection. In addition to his own testimony, the plaintiff called numerous department employees as witnesses, including the defendant Wislocki (the Cheshire mail handler); Selena Rios, department district administrator; Angel Quiros, department director of security; Christine Whidden; Captain Robert Hartnett; and Deputy Warden Richard LaFarge. These witnesses were cross-examined by the plaintiff on a range of subjects relating to department policies and practices concerning incoming mail and related security issues, media review procedures for rejected books, administrative review of grievances,

and religious services available to inmates.

The court finds that there is no credible evidence whatsoever to support the plaintiff's claim of discriminatory treatment based on religion. The rejected items—books, newspapers, blank cards and envelopes, decorated cards and artwork from relatives, etc.—were disallowed based on content neutral considerations of safety and security in a prison setting. After hearing all of the testimony and viewing all of the exhibits, the court is convinced that the items would have received identical treatment had their content related to the New York Yankees, the native birds of Indonesia, or any other subject, religious or nonreligious. This finding does not end the case in all respects, but it is important to highlight this particular finding at the outset.

## II

### LEGAL ANALYSIS

### A

### Plaintiff's First Amendment Claims

The plaintiff's first amendment claims[13] cover relatively well-worn ground. It is clear that a person's constitutionally protected speech and religious rights are not forfeited upon criminal incarceration. See, e.g., *Bell* v. *Wolfish*, 441 U.S. 520, 545, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) ("our cases have held that sentenced prisoners enjoy freedom of speech and religion under the [f]irst and [f]ourteenth [a]mendments"). It is equally clear, however, that these rights are subject to significant curtailment in the prison setting. Id. ("But our cases also have insisted on a second proposition: simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations. 'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" (quoting *Price* v. *Johnston*, 334 U.S. 266, 285, 68 S. Ct. 1049, 92 L. Ed. 1356 (1948)). These general principles are firmly established. See, e.g., *Beard* v. *Banks*, 548 U.S. 521, 528–29, 126 S. Ct. 2572, 165 L. Ed. 2d 697 (2006) (plurality opinion); *Shaw* v. *Murphy*, 532 U.S. 223, 229, 121 S. Ct. 1475, 149 L. Ed. 2d 420 (2001); *Thornburgh* v. *Abbott*, 490 U.S. 401, 409, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989); *O'Lone* v. *Estate of Shabazz*, 482 U.S. 342, 348, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987); *Turner* v. *Safley*, 482 U.S. 78, 84–85, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987).

The following analysis will focus on the plaintiff's first amendment free exercise claims because those are the focus of his case. The same legal standard, taken from *Turner* v. *Safley*, supra, 482 U.S. 78, also applies to his first amendment free speech claims, with the same results. See, e.g., *Thornburgh* v. *Abbott*, supra, 490 U.S. 414 (holding that *Turner* analysis applies to inmates' free speech claims relating to publications sent

into prison). The applicable legal analysis under *Turner* considers four factors:[14] "[I]n *Turner* [v. *Safley*, supra, 78], we adopted a unitary, deferential standard for reviewing prisoners' constitutional claims: [W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. [Id., 89]. Under this standard, four factors are relevant. First and foremost, there must be a valid, rational connection between the prison regulation and the legitimate [and neutral] governmental interest put forward to justify it. [Id.] . . . If the connection between the regulation and the asserted goal is arbitrary or irrational, then the regulation fails, irrespective of whether the other factors tilt in its favor. [Id., 89–90]. In addition, courts should consider three other factors: the existence of alternative means of exercising the right available to inmates; the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and the absence of ready alternatives available to the prison for achieving the governmental objectives. [Id., 90]." (Citation omitted; internal quotation marks omitted.) *Shaw* v. *Murphy*, supra, 532 U.S. 229–30; see, e.g., *Mikell* v. *Folino*, 722 Fed. Appx. 304, 308 (3d Cir. 2018) (applying *Turner* test to prisoner's religious freedom claims involving dietary restrictions); *Keys* v. *Torres*, 737 Fed. Appx. 717, 719 (5th Cir. 2018) (applying *Turner* test to prisoner's first amendment challenge to prison mail regulation prohibiting delivery of certain publications); *Davis* v. *Heyns*, No. 17-1268, 2017 WL 8231366, *4 (6th Cir. October 16, 2017) (applying *Turner* test to prisoner's religious freedom claims involving dietary restrictions).

The legal standard adopted in *Turner* reflects a policy of substantial deference to the judgment and expertise of prison officials with respect to issues of prison security. See, e.g., *Thornburgh* v. *Abbott*, supra, 490 U.S. 407–408 (due to "the expertise of these [prison] officials and the [recognition that the] judiciary is ill equipped to deal with the difficult and delicate problems of prison management, this [c]ourt has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world" (internal quotation marks omitted)). The court in *Turner* itself explained the underlying policy considerations: "In our view, such a standard is necessary if prison [administrators . . . and] not the courts, [are] to make the difficult judgments concerning institutional operations." (Internal quotation marks omitted.) *Turner* v. *Safley*, supra, 482 U.S. 89. "Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the [decision-making] process, for

every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration." (Internal quotation marks omitted.) Id.

The plaintiff has failed to meet his burden under the applicable legal standard.[15] His claim relating to the used books will be taken up first. Prison authorities based their refusal to deliver the three used books principally on the mandate contained in administrative directive 10.7 (4) (N), which states in relevant part: "An inmate may order books in new condition only from a publisher, book club, or book store. . . ." The directive contains two significant restrictions on an inmate's ability to obtain books from outside of the correctional facility: first, the book must be new, and second, the seller must be either the publisher, a book club or a bookstore. At trial, the court heard credible testimony from numerous department witnesses about the legitimate security concerns underlying administrative directive 10.7 (4) (N). Books in general are a particularly effective means for outsiders to pass contraband into prison.[16] It is difficult for prison staff to detect hidden items such as drugs, weapons, or secret messages (plans of illegal activity), which can easily be secreted in book bindings, between interior pages, or in other overlooked crevices or crannies. A thorough search for such contraband would require prison personnel to inspect every page of every book sent from any source to every prisoner, an untenable task. The purpose of administrative directive 10.7 (4) (N) is to restrict the flow of such contraband by limiting incoming books to new books sent directly by a publisher or other reputable source. Limiting sources to specified commercial enterprises (publishers, bookstores and book clubs) minimizes the risk that an inmate or outsider can arrange with a friend or family member for delivery of banned material. It also makes sense that new books are far easier to inspect for contraband than used books. By limiting permissible incoming items to new books only, sent by specified commercial sources only, the department directive makes it less likely that books will serve as a conduit for contraband into prison.

Substantial case law applying *Turner* v. *Safley*, supra, 482 U.S. 78, upholds the constitutionality of similar prison rules prohibiting used books or otherwise restricting the source or physical characteristics of books sent to inmates. See *Minton* v. *Childers*, 113 F. Supp. 3d 796, 802–803 (D. Md. 2015) ("The [c]ourt concludes that the [prison's] directive banning incoming used books not sent directly by the publisher is not unconstitutional. . . . The ban is expressly aimed at

advancing jail security and protecting the safety of jail personnel and other inmates and is logically connected to those goals."); *Phipps* v. *Vail*, No. C11-5093-BHS-JRC, 2012 WL 472894, *5–6 (W.D. Wn. January 9, 2012); id., *6 (rejecting inmate's first amendment challenge to correctional facility's decision to refuse delivery of two used books based on valid concern that "the chance of the book being altered or tampered with increases when the book is used [rather than new]"); see also *Bell* v. *Wolfish*, supra, 441 U.S. 550–51 (holding that first amendment is not violated by prison regulation prohibiting inmates from receiving books that were not directly mailed from publisher, book club or bookstore); *Azukas* v. *Arnone*, No. 3:14-cv-721 (RNC), 2017 WL 1282196, *2–3 (D. Conn. March 31, 2017) (rejecting inmate's first amendment challenge to Connecticut correctional facility's decision to refuse delivery of two books based on quantity limitation provision contained in administrative directive 10.7); *Walker* v. *Calderon*, No. C95-2770 FMS, 1997 WL 703774, *3 (N.D. Cal. October 31, 1997) ("[a]pplying the *Turner* analysis to the ban on the receipt of books mailed by correspondents other than approved or verified vendors, the [c]ourt finds first that the regulation is rationally connected to the prison's concerns about contraband being smuggled into the prison in book packages to which third parties have had physical access").

The first *Turner* factor, then, is easily satisfied here. There clearly is a valid, rational connection between the general prohibition on used books contained in administrative directive 10.7 (4) (N) and a legitimate governmental objective in prison security.

*Turner* also instructs courts to examine three additional factors: the existence of "alternative means of exercising the right"; "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and "the absence of ready alternatives" available to the prison for achieving the governmental alternatives. *Turner* v. *Safley*, supra, 482 U.S. 90. These considerations also favor the defendants' position on this record.

The plaintiff has at least two alternative means of exercising the right to religious freedom at issue. First, there is an administrative procedure available to the plaintiff by which he can request religious books that are unavailable. As explained, administrative directive 10.8 (5) (D) provides a mechanism by which inmates may obtain permission to engage in "individual religious practices," which includes "access to religious publications" not otherwise available in the prison library or through the usual means under administrative directive 10.7 (4) (N) (purchase of new books). The procedure requires approval by the director of religious services and the deputy commissioner of operations. The evi-

dence at trial established that the plaintiff never pursued this option. See [part I of this opinion]. Second, the plaintiff has virtually unrestricted access to new books. See, e.g., *Minton* v. *Childers*, supra, 113 F. Supp. 3d 803 ("[plaintiff] was allowed to receive new books sent directly from the publisher"). No showing has been made that the plaintiff is unable to obtain new books containing essentially the same or equivalent material as that contained in the three "out of print" books made unavailable to him under administrative directive 10.7 (4) (N). The court does not find, on this record, that any of these books contain information that is unique, unusual or particularly distinctive in form, expression or substance.

The third *Turner* factor asks what impact accommodation of the asserted right will have on prison staff, other inmates, and the allocation of prison resources generally. There are approximately 1300 inmates housed at Cheshire alone. Every day, eight to fourteen bins of incoming mail addressed to inmates are delivered for distribution at Cheshire, and, because contraband cannot be found unless it is seen or felt, every single item (except legal mail) must be visually and "tactilely" inspected by a department mail handler before it is delivered to an inmate. The mail handler must search for contraband of all types, including seemingly innocuous items that can be used for improper or illegal purposes. The task is made more difficult due to the fact that some prohibited items are easily hidden or camouflaged. Certain drugs such as "suboxone" can be easily hidden or absorbed in paper strips or other unobtrusive materials "laced" with the illegal substance, for example. This has occurred many times at department facilities in connection with incoming mail items.

Under these circumstances, and in light of the grave dangers that can arise when incoming contraband escapes detection, it is reasonable for the department to draw the line where it does, by distinguishing between new and used books as an efficient and sensible means to deploy its limited resources for the purpose of safeguarding the prison population while still allowing its residents robust, expansive access to published books. A new book mailed directly from the vendor presumably can be delivered to an inmate after a relatively quick, cursory inspection. Inspection of a used book, by contrast, would require a mail handler to engage in a time-consuming examination of the binding, cover, interior markings (for improper messages), and even individual pages (to ensure that the paper has not been glued together or "laced" with suboxone). Anything less than a painstaking, resource intensive inspection of used books would place at risk the safety and security of prison guards and other inmates alike. This third *Turner* factor therefore also weighs in favor of upholding the prison policy. See, e.g., *Phipps* v.

*Phelps*, supra, 2012 WL 472894, *6 ("[a] much more costly search process would have to be implemented [if used books were allowed]").

Fourth and finally, there is no reason for the court to believe that the policy with respect to used books is an unreasonable, "exaggerated response to prison concerns." (Internal quotation marks omitted.) *Turner* v. *Safley*, supra, 482 U.S. 90. The plaintiff has failed to identify any "alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests . . . ." Id., 91.

The plaintiff's constitutional free exercise claims regarding an asserted right to receive blank prayer cards/envelopes and nonsubscription newspapers fails for much the same reasons. Judge Christopher F. Droney addressed and rejected a similar claim in the case of *Sadler* v. *Lantz*, Civil No. 3-07-cv-1316 (CFD), 2011 WL 4561189 (D. Conn. September 30, 2011). *Sadler* apparently was brought as a free speech rather than a free exercise claim, but the same four factor *Turner* analysis was employed to adjudicate whether the inmate had a first amendment right to receive a blank greeting card and envelope from outside sources. This court finds Judge Droney's analysis persuasive. *Sadler* explains that the department's policy prohibiting incoming mail containing blank cards and unused envelopes in that case rested on the same basic, underlying set of directives relied on by the defendants in the present case: "[Department] [a]dministrative [d]irective 6.10 . . . which was in effect at the time of the rejection of the [rejected blank] card, provided that an inmate may possess only that property authorized for retention upon admission to the facility, issued while in custody, purchased in the facility commissary, or approved at the facility in accordance with this [a]dministrative [d]irective. [Id., 6.10 (1)]. Contraband is defined as anything not authorized to be in an inmate's [possession . . . . Id., 6.10 (3) (B)]. The main purpose of [a]dministrative [directive] 6.10 (1) is to minimize the opportunity for contraband to be sent to inmates from individuals outside of prison. In addition, the directive serves to minimize the time spent by correctional staff in searching correspondence." (Internal quotation marks omitted.) *Sadler* v. *Lantz*, supra, 2011 WL 4561189, *3.

Administrative directive 10.7, which was also in effect at the time of the rejection of the items mailed to the plaintiff, provided: "All incoming general correspondence shall be opened and inspected for contraband and money . . . . All incoming general correspondence may be rejected if such review discloses correspondence or material(s) which would reasonably jeopardize legitimate penological interests, including, but not limited to, material[s] which contain or [are believed to contain] or concern: (a) the transport of contraband in or out of the facility . . . . Incoming general corre-

spondence containing any of the foregoing may be restricted, confiscated, returned to the sender, retained for further investigation, referred for disciplinary proceedings or forwarded to law enforcement officials. [Id., 10.7 (4) (F) (1)]." (Internal quotation marks omitted.) *Sadler* v. *Lantz*, supra, 2011 WL 4561189, *3. These directives provided the basis for the department's prohibition of blank greeting cards. Id.[17] In addition, administrative directive 10.7 (4) (G) (1) (h) expressly prohibits inmates from receiving incoming mail containing "envelopes with or without postage stamps."[18]

These policies are content neutral and plainly bear a rational connection to the safety and security concerns identified by the department's witnesses, particularly Wislocki, Quiros, Whidden and LaFarge. As in *Sadler*, this court heard credible testimony about the real, non-fanciful risk that outsiders will attempt to convey drugs (such as suboxone) to inmates by "lacing" the decorations or adhesives contained on cards or stationery with the illegal substance.[19] See *Sadler* v. *Lantz*, supra, 2011 WL 4561189, *2. Witnesses, including District Administrator Quiros and Director Whidden, also testified credibly that careful control over the incoming supply of blank cards and envelopes in prison is considered necessary due to safety and security risks associated with barter and trade among inmates. See also id., *6 ("permitting unsigned greeting cards to be mailed to inmates would also increase the likelihood of inmate barter or trade, gambling and thefts and inmate argument and fighting, with the potential for injuries to both correctional staff and inmates"). The large volume of cards sent to the plaintiff in the present case, and the resulting resource imbalance relative to other inmates, could only have increased the potential for such problems here.

The other three *Turner* factors also weigh in favor of the constitutionality of the prohibition on incoming mail containing blank cards/envelopes. Cards, envelopes and blank paper are all available to inmates through the prison commissary. If the plaintiff does not like the preprinted messages contained on the stock greeting cards and wishes to communicate a different, more pious or serious religious message, he can use stationery to draw or write his own prayers or religious messages on his own cards. There is no reason to believe that such custom-made cards would encounter any official censorship or curtailment. (Again, the restrictions confronted by the plaintiff have nothing to do with the religious content of the incoming cards. Alternatively, if the plaintiff prefers commercially printed religious cards over the homemade variety but cannot find sufficiently solemn cards at the commissary, he can request individualized approval from the director of religious services to purchase otherwise unavailable religious cards, pursuant to administrative directive 10.8 (5) (I). See [part I of this opinion].

The court also finds that there is no evidence indicating that it would be practicable for the department to take reasonable steps to accommodate the asserted right to blank prayer cards while still safeguarding prison security. There are no practical, cost-effective means for individually testing or inspecting the cards and envelopes for drugs like suboxone. Nor have the defendants suggested how the prison authorities might mitigate the dangers arising from the underground economy that inevitably would accompany the unrestricted incoming flow of blank cards/envelopes to inmates. The department policy barring these items does not violate the plaintiff's constitutional right to free exercise of religion. See *Sadler* v. *Lantz*, supra, 2011 WL 4561189, *7; *Spruytte* v. *Feighner*, Docket No. 93-2009, 1994 WL 32669, *1 (6th Cir. February 4, 1994) ("Michigan Department of Corrections Policy Directive PD-BCF-63.03 requires prisoners to purchase items only from authorized vendors. [The plaintiff's] parents, who are not authorized vendors, sent him the greeting card in the mail. The defendants' refusal to allow [the plaintiff] to receive the card did not infringe upon [his] constitutional rights."); *Avery* v. *Powell*, 806 F. Supp. 7, 10–11 (D.N.H. 1992) (upholding constitutionality of prison policy prohibiting inmates from obtaining blank greeting cards except from authorized vendors).

The court reaches the same conclusion with respect to the department's ban on newspapers or magazines sent from sources other than the publisher. For much the same reason that incoming mail containing books must be mailed to inmates from presumptively legitimate commercial sources (publisher, book club or bookstore), it makes sense that the department has seen fit to impose similar restrictions on newspapers and magazines. See, e.g., *Ward* v. *Washtenaw County Sheriff's Dept.*, 881 F.2d 325, 328–30 (6th Cir. 1989) (upholding constitutionality of prison's "publisher-only" restriction on magazines); *Hurd* v. *Williams*, 755 F.2d 306, 307–308 (3d Cir. 1985) (upholding constitutionality of prison's "publisher-only" restriction on newspapers and periodicals); *Kines* v. *Day*, 754 F.2d 28 (1st Cir. 1985) (upholding constitutionality of prison's "publisher-only" restriction on hardcover, softcover, and newspaper publications); cf. *Minton* v. *Childers*, supra, 113 F. Supp. 3d 803 ("[t]he [c]ourt concludes that the [prison] directive banning incoming used books not sent directly by the publisher is not unconstitutional [under *Turner*]"); *Walker* v. *Calderon*, supra, 1997 WL 703774, *3 ("[a]pplying the *Turner* analysis to the ban on the receipt of books mailed by correspondents other than approved or verified vendors, the [c]ourt finds first that the regulation is rationally connected to the prison's concerns about contraband being smuggled into the prison in book packages to which third parties have had physical access").

Newspapers and magazines, unlike books, usually do not have bindings, but they do contain voluminous densely printed pages, and this physical characteristic justifies the source restriction imposed by the department. See *Allen* v. *Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (observing that "bulk" of newspaper makes it difficult to inspect for prohibited content and contraband in prison setting).[20] The plaintiff does not claim that he is unable to order a subscription to The Catholic Transcript or any of the other religious (or nonreligious) newspapers he wishes to read. The publications are readily available to him. His claim is solely based on the notion that he should be able to receive these publications from sources other than the publisher. On this evidentiary record, the claim is not viable under *Turner*. There is no need to repeat the entire analysis again. See [part II A of this opinion].

To summarize, the plaintiff has failed to carry his burden to establish any violation of his first amendment rights. The challenged department policies, on this record, pass constitutional muster under the *Turner* analysis.

## B

### Due Process and Equal Protection

The plaintiff's substantive due process claim rests on his assertion that he has been "deprive[d]" of his Catholic religious faith by the department as a result of its refusal to deliver the used books to study for the priesthood and the prayer cards containing statements of faith central to his religious beliefs. See, e.g., Plaintiff's Response to Defendants' Posttrial Briefs and Facts, dated June 23, 2017, at 29. He argues that the department's practices are "sadistic and evil," and says that the department is operating a "concentration camp that has no respect for human rights, dignity, respect for any human life." Id. The plaintiff's substantive due process claim fails for two reasons. First, the Supreme Court has instructed that "[w]here a particular [a]mendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that [a]mendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." (Internal quotation marks omitted.) *County of Sacramento* v. *Lewis*, 523 U.S. 833, 842, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998); see also *Southerland* v. *City of New York*, 680 F.3d 127, 142–43 (2d Cir. 2012), cert. denied, 568 U.S. 1150, 133 S. Ct. 980, 184 L. Ed. 2d 773 (2013). The plaintiff's claims in this case are fundamentally grounded in rights defined by the first amendment. His claims based on religious freedom and freedom of speech therefore should not be reevaluated under substantive due process principles.

Second, even if (or to the extent that) the plaintiff's allegations warrant independent consideration as sub-

stantive due process claims, no violation has occurred on these facts. A person's substantive due process right under the fourteenth amendment is violated when the government's conduct "shocks the conscience." See, e.g., *Velez* v. *Levy*, 401 F.3d 75, 93 (2d Cir. 2005) (substantive due process is violated by governmental conduct that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," quoting *County of Sacramento* v. *Lewis*, supra, 523 U.S. 848 n.8 (internal quotation marks omitted)). Although no objective measure has been developed to identify such a violation with scientific precision, it is understood that "malicious and sadistic" abuses of power by government officials, intended to "oppress or to cause injury," and designed for no legitimate government purpose, "unquestionably shock the conscience." (Internal quotation marks omitted.) *Velez* v. *Levy*, supra, 94. The doctrine is designed to protect the individual "against . . . the exercise of power without any reasonable justification in the service of a legitimate governmental objective . . . ." (Citation omitted.) *County of Sacramento* v. *Lewis*, supra, 846.

The record is devoid of any evidence supporting the plaintiff's substantive due process claim. In prison, he remains free to pray and believe as he wishes, attend religious services, abide by religious dietary rules, purchase religious texts (liturgical, theological, legal, historical, and otherwise), and read those texts, virtually to his heart's content. The sole limitation is that the purchased books must be available from a commercial seller in new condition. This restriction does not shock the court's conscience. To the contrary, it appears to be, at most, a relatively insignificant constraint. The plaintiff is fortunate to have the financial resources to purchase new books, religious and nonreligious alike, from any publisher or bookstore that sells books to the public. He clearly has the intelligence and practical ability to arrange for such purchases, and has done so during his incarceration. Or he can ask friends and family to place the order for him. He also can subscribe to religious newspapers and have them sent by the publisher to his prison address. Or, again, he can have friends and family make those arrangements for him. He can purchase greeting cards from the commissary or request permission from the religious director to buy more religiously minded cards from other sources, or he can make his own customized prayer cards using materials available to him for correspondence with the outside world.

The court does not wish to trivialize the plaintiff's feeling, expressed so intensively in his briefs and other submissions, that he is subject to severe restrictions on his liberty while incarcerated. He must appreciate, however, that loss of liberty is largely the point of incarceration as a criminal sanction. In his case, that period of confinement is extremely lengthy, and it seems likely

that he must confront, on a daily basis, the harsh and painful reality that he will spend most or all of his remaining life behind bars, under near constant surveillance and subject to the strict control of prison rules enforced by prison guards. The company he keeps, moreover, consists of other inmates similarly situated in many respects. At times, the plaintiff undoubtedly must feel very lonely, indeed. He also must live with the heavy burden of his particular crime, the killing of his father. This combination of factors may explain, at least in part, his (re)turn to religion.

Gawlik cannot be blamed for feeling frustrated and even dehumanized by his circumstances, and it would not be surprising if these circumstances have made him peculiarly sensitive to the sting of certain restrictions, as applied to him. His inability to order a used book on a particular subject, for example, may be highly cathected in a way that fuels his sense of outrage. Perhaps not. But whatever the reason, it is clear that the plaintiff's own personal sense of right and wrong seems genuinely shocked by the deprivation of which he complains. His feelings are not shared by the judicial conscience charged with safeguarding substantive due process, certainly not on this record.

For the reasons addressed in the preceding paragraph, Gawlik can be forgiven for the inapt and wildly inaccurate comparison contained in his brief, quoted above, in which he likens his conditions to those in a "concentration camp." He should be reminded that he sits in prison, not because of his religion, ethnicity or race, but because he killed a man. Out of respect for the historical record, and in recognition of his own personal role in creating his current state of deprivation, it seems fair to ask him to acknowledge the fundamental differences between his present circumstances and those existing at the "concentration camps" to which he refers.

The plaintiff's procedural due process claim focuses on two alleged deficiencies in the department's treatment of his mail.[21] The first relates to the alleged failure of department staff, on occasion, to follow the department's own written rules requiring staff to notify the plaintiff that his incoming mail had been rejected. See Administrative Directive 10.7 (4) (G) (2). The second involves allegations that the Cheshire staff violated applicable procedures by rejecting the used books sent to the plaintiff without complying with the "media review procedures" set forth in administrative directive 10.7 (4) (G). Neither of these constitutional claims has merit.

A procedural due process claim must be based on the deprivation of a constitutionally protected liberty or property interest. See, e.g., *Kentucky Dept. of Corrections* v. *Thompson*, 490 U.S. 454, 460, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989) ("The types of interests that

constitute liberty and property for [f]ourteenth [a]mendment purposes are not unlimited; the interest must rise to more than an abstract need or desire . . . and must be based on more than a unilateral hope . . . . Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it. Protected liberty interests may arise from two sources—the [d]ue [p]rocess [c]lause itself and the laws of the [s]tates." (Citations omitted; internal quotation marks omitted.)). Numerous doctrinal principles have been developed over the years to guide the analysis of procedural due process claims arising in the prison context. The oft-repeated starting point is the observation that "[although] prisoners do not shed all constitutional rights at the prison gate . . . [l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." (Citation omitted; internal quotation marks omitted.) *Sandin* v. *Conner*, 515 U.S. 472, 485, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995). Under *Sandin*, which involved claims relating to prison disciplinary proceedings, the court held that inmates are not entitled to procedural due process protections unless the disciplinary measure imposes an "atypical and significant hardship on the inmate *in relation to the ordinary incidents of prison life.*" (Emphasis added.) Id., 484. This standard has been applied to a wide variety of due process claims made by prisoners since *Sandin* was decided in 1995. See, e.g., *Proctor* v. *LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (reciting district judge's unchallenged conclusion that confinement of prisoner in segregated housing for more than [one] decade gave rise to cognizable liberty interest under *Sandin*); *Graziani* v. *Murphy*, No. 3:11-CV-1615 (RNC), 2012 WL 2785907, *3 (D. Conn. July 5, 2012) (holding under *Sandin* that complaint failed to state procedural due process claim arising from suspension of plaintiff's eligibility for contact visits in prison).

*Sandin* also makes it clear that the due process clause does not constitutionalize all ostensibly "mandatory" internal rules and directives governing prison life. See *Sandin* v. *Conner*, supra, 515 U.S. 483–84 (expressly rejecting idea that constitutionally protected liberty interest in prison context is created by mandatory language in prison regulations). This holding is consistent with the well settled view that a procedural due process violation is not triggered merely upon a showing, without more, that prison officials have failed to abide by the correctional system's own written grievance procedures: "Courts of appeal have held that inmates do not have a constitutionally protected liberty interest in having prison officials comply with institutional grievance procedures. See, e.g., *Grieveson* v. *Anderson*, 538 F.3d 763, 772 (7th Cir. 2008); *Thomas* v. *Warner*, 237 Fed. Appx. 435, 437–38 (11th Cir. 2007); *Rhoades* v. *Adams*, 194 Fed. Appx. 93, 95 (3d Cir. 2006); *Geiger* v.

*Jowers*, 404 F.3d 371, 373–74 (5th Cir. 2005); *Ramirez* v. *Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) [cert. denied sub nom. *McEnroe* v. *Ramirez*, 541 U.S. 1063, 124 S. Ct. 2388, 158 L. Ed. 2d 963 (2004)]; *Buckley* v. *Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) (per curiam). Thus, to the extent that the complaint may be construed to assert a due process claim regarding any institutional grievances, the complaint fails to state a cognizable claim." *Gaskin* v. *Albreski*, No. 3:11-cv-834 AWT, 2012 WL 827073, *2 (D. Conn. March 8, 2012); accord, e.g., *Fernandez* v. *Armstrong*, No. 3:02-CV-2252 (CFD), 2005 WL 733664, *9 (D. Conn. March 30, 2005) (holding that failure of department staff to abide by grievance procedures set forth in administrative directive 9.6, standing alone, did not state cognizable claim under federal law).

The defendants argue that the plaintiff's procedural due process claims in the present case are foreclosed by *Sandin* because the limitations imposed on the plaintiff's access to reading materials and incoming mail fall far short of the type of "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" necessary to trigger due process protections. *Sandin* v. *Conner*, supra, 515 U.S. 484.[22] The court agrees that the plaintiff's procedural due process claims fail under the *Sandin* standard.

Less certain, however, is that the *Sandin* standard encompasses the entire due process analysis applicable to claims implicating first amendment rights, as the plaintiff's claims do. The question arises because the Supreme Court previously has held that the censorship of inmate mail by prison authorities must be accompanied by certain basic due process protections. See *Procunier* v. *Martinez*, 416 U.S. 396, 418–19, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974) ("The District Court [held that due process] required that an inmate be notified of the rejection of a letter written by or addressed to him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence. These requirements do not appear to be unduly burdensome, nor do appellants so contend."). Although the first amendment analysis adopted in *Procunier* has since been abandoned in part; see *Thornburgh* v. *Abbott*, supra, 490 U.S. 413–14 (overruling *Procunier*'s first amendment analysis as it relates to incoming mail but not outgoing mail); at least some courts have held that the due process component of *Procunier* remains good law, such that inmate mail cannot be censored without notice to the inmate and a right to appeal the rejection to a prison official other than the original decision maker. See, e.g., *Krug* v. *Lutz*, 329 F.3d 692, 697 (9th Cir. 2003); *Witherow* v. *Crawford*, 468 F. Supp. 2d 1253, 1271 (D. Nev. 2006).

There is no need here to definitively resolve this legal

question.[23] Even assuming that the plaintiff's right to receive incoming mail is entitled to some procedural due process protection after *Sandin*, the court finds that he received all the process that was due under the circumstances. See *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) (enumerating factors to be considered). The plaintiff received abundant written notifications from the mail room staff at Cheshire informing him that the blank prayer cards, used books, repackaged newspapers, and other items were being rejected. The plaintiff filed multiple grievances challenging the rejections and explaining why, in his view, the withholding of mail was improper, unjustified and illegal. The grievances were processed up the chain of command; none succeeded. The fact that the plaintiff was displeased with the result, of course, does not establish a due process violation.

The plaintiff complains that he was not given written notification of rejection with respect to every single undelivered item of mail, and it appears to be the case that the mail room did not always provide notice of rejection on every single occasion due to the volume and/or frequency of prohibited items (prayer cards/envelopes in particular). The fact remains that the plaintiff received written notice sufficient to make him fully aware of the basic nature and scope of the interdiction: he knew that the mail room staff was not delivering his mail containing blank prayer cards, envelopes, used books, nonsubscription newspapers, and artwork containing crayon and/or glitter. He received many notices and filed many grievances. At least on the facts of this case, when the plaintiff was made aware by written notice of the nature and scope of the challenged conduct, due process did not require item by item notification of every item. To require redundant notification under these circumstances would serve no purpose except to impose a significant, unnecessary administrative burden on prison staff.

The plaintiff also contends that his due process rights were violated because the three used books ordered by him were rejected without review by the "media review board" (MRB) under the procedures set forth in administrative directive 10.7. This argument is based on a fundamental misunderstanding about the function of the MRB, which exists to promulgate guidelines and conduct substantive review and censorship of incoming publications that have been rejected on initial review based on the content of those incoming materials. Thus, for example, if a book or other incoming publication is rejected by mail room staff because of inappropriate sexual content, or because it contains information about making weapons or alcohol, or depicts methods of escape from correctional facilities, the initial decision to reject the item is subject to review by the MRB. See Administrative Directive 10.7 (4) (N) (1) and (2). The MRB process played no role in the plaintiff's case

because the used books were not rejected based on their substantive content—they were rejected because they were in used condition. See [parts I and II A of this opinion]. The plaintiff was not entitled to MRB review on these facts.[24]

The plaintiff's equal protection claim is not well elaborated, but the crux of his argument is that the defendants treated incoming mail of a "religious" nature differently than secular mail. There is no evidentiary basis for this claim. To the contrary, it is clear to the court that all of the items at issue were rejected based on neutral criteria relating to legitimate concerns regarding institutional security and safety. Religious content had nothing to do with it. There is no credible evidence that otherwise similar nonreligious material (e.g., secular used books, secular blank greeting cards from outside sources, or secular repackaged newspapers) were treated any differently. There simply was no evidence of discrimination—or discriminatory intent. See *Arlington Heights* v. *Metropolitan District Housing Corp.*, 429 U.S. 252, 265, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977) ("[p]roof of . . . discriminatory intent or purpose is required to show a violation of the [e]qual [p]rotection [c]lause").

## C

### Plaintiff's Statutory Claims

#### 1

#### Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc

Section 3 of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc et seq., states: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person— (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1 (a) (2012).

Under the statute's burden-shifting framework, the plaintiff first must show that (1) the relevant religious exercise is "grounded in a sincerely held religious belief," and (2) the government's action or policy "substantially burden[s] that exercise . . . ." *Holt* v. *Hobbs*, 574 U.S. 352, 361, 135 S. Ct. 853, 190 L. Ed. 2d 747 (2015). If the plaintiff carries this threshold burden, the burden shifts to the government to show that the challenged action or policy is (1) in furtherance of a compelling governmental interest and (2) the least restrictive means of furthering that interest. Id., 362. Despite RLUIPA's express purpose to protect the religious observances of individualized persons, the statute

nevertheless anticipated that courts entertaining RLU-IPA challenges "would accord 'due deference to the experience and expertise of prison and jail administrators.'" *Cutter* v. *Wilkinson*, 544 U.S. 709, 717, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005) (quoting 146 Cong. Rec. 16,698, 16,699 (2000), joint statement of Senator Orrin G. Hatch and Senator Edward M. Kennedy). "Due deference," of course, does not mean "unquestioning" acceptance. *Holt* v. *Hobbs*, supra, 364.

The court does not question the sincerity of the plaintiff's religious beliefs. He has failed to show, however, that the policies and practices at issue have imposed any meaningful, much less "substantial," burden on the exercise of his religion. There is no evidence that the defendants have done anything that directly or indirectly requires or compels or pressures the plaintiff to "engage in conduct that seriously violates his religious beliefs"; *Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014); or that they have done anything that would prevent him from participating in any activity or practice necessary for him to partake in religious exercise. See, e.g., *Holt* v. *Hobbs*, supra, 574 U.S. 361 (prison policy requiring plaintiff to shave his beard, contrary to religious law, substantially burdened religious exercise). It may cause the plaintiff a slight inconvenience to order new books rather than used books on a particular subject, or order newspapers directly from the publisher, or make his own religious greeting cards, but these are truly de minimis constraints and cannot fairly be considered to "burden" the exercise of his religion. There is nothing in the record to support a finding that the unavailability of the books, newspapers or cards at issue actually impairs or burdens the plaintiff's religious exercise in any material or meaningful respect. See, e.g., *Daker* v. *Warren*, 660 Fed. Appx. 737, 746 (11th Cir. 2016) (per curiam) (holding that prisoner failed to establish RLU-IPA violation in connection with prison's ban on hardcover books because, "[a]lthough [the plaintiff] listed some religious books that he could only obtain in hardcover format . . . he did not explain or show how the inability to acquire these books constituted a substantial burden on his religious exercise" (citation omitted)), cert. denied, ___ U.S. ___, 138 S. Ct. 94, 199 L. Ed. 2d 60 (2017), and cert. denied, ___ U.S. ___, 138 S. Ct. 98, 199 L. Ed. 2d 60 (2017). The plaintiff is offended by the defendants' assertion of authority, which makes certain items available by mail only in accordance with specified security related procedures, and he might derive religious gratification in having access to the prohibited items (used books and prayer cards). This sense of subjective frustration, however, and the plaintiff's preference for alternative or additional means of religious gratification, do not establish that the prison policies at issue substantially burden the plaintiff's free exercise of religion. See, e.g., *Robinson* v. *Jackson*, 615

Fed. Appx. 310, 313–14 (6th Cir. 2015) (holding that prison policy of providing Muslim inmate vegetarian entrees without providing Halal meat entrees did not substantially burden free exercise because vegetarian entrees meet requirements of Halal and, therefore, meals do not violate religious beliefs, despite Halal meat entrees being preferred).

2

Connecticut Act Concerning Religious Freedom

Connecticut has adopted a "Little RFRA," the Act Concerning Religious Freedom (ACRF), General Statutes § 52-571b.[25] The ACRF prohibits the state from burdening a person's exercise of religious freedom under [article first, § 3] of the Connecticut constitution, even if the burden results from a rule of general applicability; General Statutes § 52-571b (a); unless the state can demonstrate that application of the burden to the person (1) is in furtherance of a compelling governmental interest, and (2) is the least restrictive means of furthering that compelling governmental interest. General Statutes § 52-571b (b).

The statute does not contain definitions of its operative terms. In *Rweyemamu* v. *Commission on Human Rights & Opportunities*, 98 Conn. App. 646, 659, 911 A.2d 319 (2006), cert. denied, 281 Conn. 911, 916 A.2d 51, cert. denied, 552 U.S. 886, 128 S. Ct. 206, 169 L. Ed. 2d 144 (2007), our Appellate Court derived a nuanced understanding of the statute's key provisions, including the prohibition against a state imposed " 'burden [on] a person's exercise of religion' "; id., 656 n.7; by reviewing the legislative history in light of related doctrinal developments taking place at the federal level. Id., 659–64. Two important points emerge from the *Rweyemamu* analysis. First, the "overarching purpose" of the statute; id., 660; was to restore free exercise jurisprudence to its status prior to the United States Supreme Court's decision in *Employment Division, Dept. of Human Resources* v. *Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990). See *Rweyemamu* v. *Commission on Human Rights & Opportunities*, supra, 660–61.[26] Second, the term " 'exercise of religion' " in subsections (a) and (b) of the ACRF; id., 656 n.7; refers specifically to religious rituals and practices (as opposed to religious beliefs). See id., 664 ("[b]y protecting 'free exercise' with the strict scrutiny test of subsections (a) and (b), the legislature intended to provide greater protection to religious *practices*, such as the ritualistic use of peyote at issue in *Smith*" (emphasis in original)); id., 664 n.10 (citing to legislative history to provide examples of kind of free exercise practices, such as lighting of candles in church, receiving of wine at Holy Communion, and wearing yarmulke in court).

The clarification provided in *Rweyemamu* is useful

and confirms that the plaintiff cannot prevail under the ACRF. There is no evidence that the prison policies under review in the present case impose any material burden on the plaintiff's "religious exercise" within the meaning of the statute. The plaintiff remains fully able to engage in the rituals, rites and practices of his chosen religion by attending mass, reading the Bible and other sacred texts, observing Lenten dietary restrictions, and so forth. On this record, the fact that the plaintiff cannot purchase the three out of print books, or receive newspapers and prayer cards from unauthorized sources, fails to establish any violation of the ACRF.

### D

### Plaintiff's Claim Under Uniform Administrative Procedure Act

The plaintiff's final argument is that the department's administrative directives at issue are invalid because they were not promulgated in accordance with the requirements of the UAPA. To adopt a regulation under the UAPA, an agency must comply with extensive procedural requirements, which include, among other things, legislative review and approval. See General Statutes § 4-168. The plaintiff contends that the department's failure to follow the required procedures under the UAPA renders the relevant administrative directives legally defective. This claim is without merit for a number of reasons.

The Appellate Court's holding in *Pierce* v. *Lantz*, 113 Conn. App. 98, 965 A.2d 576, cert. denied, 293 Conn. 915, 979 A.2d 490 (2009), which obviously binds this court, largely disposes of the plaintiff's argument. See also *Harris* v. *Armstrong*, Docket No. CV-03-0825678-S, 2009 WL 5342484, *3–5 (Conn. Super. December 7, 2009) (*Prescott, J.*) (following *Pierce* to uphold validity of department's administrative directive regarding outgoing mail). *Pierce* involved an inmate's challenges to the validity of a department administrative directive relating to incoming mail restrictions, among other things: the plaintiff objected in particular to department "censorship" of publications depicting sexual activity between consenting adults. *Pierce* v. *Lantz*, supra, 100. He argued, as the plaintiff does here, that the relevant administrative directive—which, as in the present case, was also contained in administrative directive 10.7—had not been adopted as a "regulation" in accordance with the UAPA. Id. The Appellate Court rejected the claim. It reasoned that the administrative directive at issue represented a perfectly legitimate intra-agency interpretation and application of existing regulatory authority conferred on the department and its commissioner by General Statutes § 18-81 and various regulations promulgated thereunder. Id., 103–104.

*Pierce* points out, first of all, that § 18-81 expressly authorizes the Commissioner of Correction to "estab-

lish rules for the administrative practices and custodial and rehabilitative methods of [such correctional] institutions . . . in accordance with recognized correctional standards." General Statutes § 18-81. The decision also emphasizes that the administrative guidelines at issue fit within an existing regulatory framework, which not only confers general authority upon the commissioner to administer and direct department operations, including supervision and direction of department facilities and institutions under department control, but also contains provisions specifically authorizing inspection and rejection of incoming mail for safety and security reasons. *Pierce* v. *Lantz*, supra, 113 Conn. App. 103–104 (discussing Regs., Conn. State Agencies § 18-81-1 (general authority), § 18-81-32 (authority to inspect and reject incoming mail) and § 18-81-39 (authority to review and reject incoming publications)). This statutory and regulatory framework, concludes the Appellate Court, "empowers the commissioner to create such administrative directives for the administration and operation of the correctional institutions." Id., 104.

*Pierce* provides especially strong guidance here because it involved a challenge to the same administrative directive at issue in the present case, administrative directive 10.7, relating to restrictions on incoming mail. And, as *Pierce* observes, the core provisions of administrative directive 10.7 that authorize rejection of incoming mail and publications have been promulgated as regulations under the UAPA. See Regs., Conn. State Agencies §§ 18-81-32 and 18-81-39.[27] Administrative directive 10-7 contains more detailed guidance than the regulations, as one might expect, but the fundamental authority to inspect mail, and reject items posing a potential threat to security, derives from the governing UAPA compliant regulatory framework.

A second, independent reason for rejecting the plaintiff's UAPA based argument is that General Statutes § 18-78a exempts "security and emergency procedures" promulgated by the department from the UAPA's procedural requirements. Section 18-78a (a) (1) provides in relevant part: "The provisions of chapter 54 [the UAPA] shall apply to the Department of Correction, except that in adopting regulations in regard to riot control procedures, security and emergency procedures, disciplinary action or classification the Department of Correction shall not be required to follow the procedures in sections 4-168, 4-168a, 4-168b, 4-172, 4-173, 4-174, and 4-176. . . ." The various administrative directives relied on by the defendants to reject the mail items at issue in the present case were "security" procedures within the meaning of § 18-78a (a) (1) and therefore are exempt from the procedural requirements of the UAPA. See *Beasley* v. *Commissioner of Correction*, 50 Conn. App. 421, 434–36, 718 A.2d 487 (1998) (holding that administrative directive relating to inmate classification was

exempt from UAPA under § 18-78a (a) (1)), aff'd, 249 Conn. 499, 733 A.2d 833 (1999); *Harris* v. *Armstrong*, supra, 2009 WL 5342484, *5 (same holding with respect to administrative directive 10.7).

## III

## CONCLUSION

Judgment shall enter for the defendants. No costs.

\* Affirmed. *Gawlik* v. *Semple*, 197 Conn. App.     ,     A.3d     (2020).

[1] The final brief was filed July 17, 2017. The parties thereafter waived the 120 day deadline set forth in General Statutes § 51-183b. See Docket Entry 133.00 (Notice of Joint Consent, dated October 27, 2017).

[2] The plaintiff is not enrolled in any organized educational or training program to study for the priesthood.

[3] The record also includes reference to a used book entitled The Lovely Eucharist and Jesus Christ, which the Cheshire prison authorities also rejected for delivery to the plaintiff. It is unclear if this was a fourth book, or, instead, a reference by a different name to the third book listed above. There is no need to resolve the question for purposes of this adjudication.

[4] The precise meaning of this language is not crystal clear. It could mean (as the department maintains) that inmates may order for purchase only new books, and those purchases may be made only from the designated categories of vendors (publishers, book clubs or bookstores). Alternatively, the directive could be construed to mean that inmates may order only new books from the designated vendors (publishers or bookstores). This reading would imply, or at least leave open the possibility, that inmates are allowed to order used books and nonbook publications from sources other than publishers or bookstores. The plaintiff does not appear to challenge the department's construction as a grammatical matter. In any event, it is clear to the court that the department's construction is the intended meaning.

[5] A few other religious magazines/pamphlets are also included by the plaintiff in this category of rejected items. See Plaintiff's Exhibit 6.

[6] The problem involving delivery of newspapers to the plaintiff did not arise until after this lawsuit was filed. The plaintiff never amended the complaint to include a claim based on rejection of the newspapers, but the issue was made part of the case by the submission of such evidence at trial, without objection. The newspaper issue also was addressed by the parties in their respective posttrial briefs. The court deems the complaint to have been amended to conform to the proof in this regard.

[7] The court's findings are based solely on evidence presented at trial. The court cannot, and has not, taken into consideration any nonrecord exhibits submitted with the plaintiff's posttrial briefs. The plaintiff's posttrial briefs include certain factual assertions and documents relating, in particular, to alleged efforts by him to obtain individualized permission, on religious grounds, to obtain access to otherwise prohibited items. The plaintiff was given every opportunity to present his proof at trial. He was well prepared and well organized, and did not appear to have any difficulty marshaling the evidence as he deemed necessary. There was clear and unequivocal evidence submitted at trial about what the plaintiff did—and did not do— as part of his efforts to obtain the religious materials at issue. No extrarecord submissions on this topic will be considered by the court.

[8] This same directive also states: "Donated religious articles and religious items shall not be permitted from any source." Administrative Directive 10.8 (5) (I). The plaintiff's alternative under administrative directive 10.8 (5) (I) was to seek permission to purchase the type of prayer cards that suited his preferences. The record is clear that he had abundant personal funds available to him, had he wished to avail himself of this option.

[9] "For institutional safety and security, all recommendations for religious practices shall require approval of the Deputy Commissioner of Operations or designee in consultation with the Director of Religious Services." Administrative Directive 10.8 (5) (D).

[10] The parenthetical observation in the text is common knowledge in this day and age, but is not part of the record, and is not relied on by the court in reaching its conclusions in this case. It is made for the benefit of any reader who may be interested in seeking a nonjudicial solution to similar problems in the future. Vendors such as Amazon and Barnes & Noble offer for sale more new book titles than could be read in a lifetime. These vendors apparently will ship new books directly to correctional facilities upon pur-

chase by or on behalf of an inmate. See, e.g., https://www.amazon.com/gp/
help/customer/display.html?nodeId=201910480. If an inmate is unable to
place an order directly, the Connecticut Department of Correction's website
indicates that friends or family can order new books from such vendors
for direct mailing to the correctional facility. See https://portal.ct.gov/DOC/
Common-Elements, Common-Elements/Frequently-Asked-Questions-FAQ.

Again, this footnote should not be understood as stating factual findings
in the present case. It is included for informational purposes only, with the
hope that the information might reduce the need for similar book related
prisoner litigation in the future.

[11] Quotation marks are used because the plaintiff's position fails to
acknowledge the significant limitations on these rights in the prison setting,
as discussed in the legal analysis [in part II of this opinion].

[12] The plaintiff's administrative complaints contain allegations concerning
other department employees as well, but Wislocki is the primary focus of
his grievances.

[13] The plaintiff raises constitutional free speech as well as religious free-
dom claims under both the federal and Connecticut constitutions. He pro-
vides no independent analysis of the state constitutional claims, however,
and those claims therefore are deemed abandoned. See *State* v. *Arias*, 322
Conn. 170, 185 n.4, 140 A.3d 200 (2016) ("[b]ecause the defendant has not
provided an independent analysis of his state constitutional claim under
*State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), we consider
that claim abandoned and unreviewable"); *Connecticut Light & Power Co.*
v. *Dept. of Public Utility Control*, 266 Conn. 108, 120, 830 A.2d 1121 (2003)
("[The Connecticut Supreme Court] repeatedly [has] stated that [it is] not
required to review issues that have been improperly presented to [it] through
an inadequate brief. . . . Where a claim is asserted in the statement of
issues but thereafter receives only cursory attention in the brief without
substantive discussion or citation of authorities, it is deemed to be aban-
doned. . . . *These same principles apply to claims raised in the trial
court*." (Citation omitted; emphasis added; internal quotation marks
omitted.)).

[14] Many courts, before reaching the *Turner* factors, conduct a "threshold"
inquiry requiring the plaintiff to show "that the disputed conduct substan-
tially burdens his sincerely held religious beliefs." *Salahuddin* v. *Goord*,
467 F.3d 263, 274–75 (2d Cir. 2006). At least in the United States Court of
Appeals for the Second Circuit, the continuing vitality of the "substantial
burden" test in constitutional free exercise cases remains an open question
after the Supreme Court's statement, in *Employment Division, Dept. of
Human Resources* v. *Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876
(1990), that application of the test "embroils courts in the unacceptable
business of evaluating the relative merits of differing religious claims."
(Internal quotation marks omitted.) *Holland* v. *Goord*, 758 F.3d 215, 220 (2d
Cir. 2014); see *Salahuddin* v. *Goord*, supra, 274 n.3; *George* v. *County of
Westchester*, No. 17-CV-3632 (NSR) (JCM), 2018 WL 3364393, *3 (S.D.N.Y.
July 10, 2018); *Sabir* v. *Williams*, No. 3:17-cv-749 (VAB), 2017 WL 6514694,
*5 (D. Conn. December 19, 2017). Because its current vitality as part of the
constitutional free exercise analysis remains in doubt, and because the
plaintiff's free exercise claim here fails for other reasons under the four
factor *Turner* test, the court will not consider the "substantial burden" issue
as part of its constitutional analysis. If the issue were considered, however,
it would be decided against the plaintiff. See [part II B of this opinion]
(analyzing "substantial burden" factor in connection with plaintiff's claims
under Religious Land Use and Institutionalized Persons Act of 2000, 42
U.S.C. § 2000cc et seq.).

[15] "The burden, moreover, is not on the [s]tate to prove the validity of
prison regulations but on the prisoner to disprove it." *Overton* v. *Bazzetta*,
539 U.S. 126, 132, 123 S. Ct. 2162, 156 L. Ed. 2d 162 (2003).

[16] "Contraband" necessarily includes a very broad category of items in
the prison context because an inmate's right to possess personal property
is strictly limited due to safety and security concerns. See Administrative
Directive 10.7 (3) (A) ("Definitions/Acronyms") ("Contraband. Anything not
authorized to be in an inmate's possession or anything used in an unautho-
rized or prohibited manner."). The basic limitation is set forth in administra-
tive directive 6.10 (1) ("Inmate Property," "Policy"), which states: "An inmate
may possess only that property authorized for retention upon admission to
the facility, issued while in custody, purchased in the facility commissary,
or approved at the facility in accordance with this Administrative Directive."
In this context, it is important to be aware that many items that we may

consider ordinary and innocuous can easily be made into weapons or used for destructive purposes in a prison setting. Shoelaces are one of countless examples. Some such items (sewing needles, for example) are easily hidden. The scarcity of personal property among inmates gives rise to additional security issues. See [part II A of this opinion].

[17] The relevant language in the administrative directives remains essentially unchanged in substance since *Sadler*, which was decided in 2011. Two slight alterations made by the department in 2013 are indicated by the court in the quoted excerpt above using brackets.

[18] To ensure the ready availability of materials needed by inmates to correspond in writing with the outside world, administrative directive 10.7 (4) (P) mandates that "[e]ach correctional facility commissary shall sell . . . stationery, envelopes, postcards, greeting cards and postage . . . ." In addition, indigent inmates must be provided postage and writing materials free of charge. See Administrative Directive 10.7 (4) (D).

[19] The testimony and exhibits established that suboxone and certain other drugs can be concealed in decorative materials (script or drawings made with crayon, colored pencil, or glitter) used in cards and artwork mailed to inmates. See, e.g., Defendants' Exhibits A, B.

[20] *Allen* v. *Coughlin*, supra, 64 F.3d 77, uses this very point to distinguish between "publisher-only" rules as applied to entire newspapers, which pass constitutional muster under *Turner*, and a rule that would extend the publisher only rule to newspaper clippings, which the United States Court of Appeals for the Second Circuit suggests would be impermissible under *Turner* due to the relative ease of inspecting clippings. Id., 80–81. Newspaper clippings are not at issue in this case.

[21] Additional procedural grievances are also mentioned in the plaintiff's briefs, but it has been difficult to discern the precise contours of the plaintiff's procedural due process claims, in part because the plaintiff's written presentation contains passing references to certain factual allegations made in multiple, partially duplicative filings. The court has done its best to identify the specific procedural due process claims for adjudication.

[22] The *Sandin* standard was formulated to determine the existence of a cognizable "liberty" interest entitled to due process protection. The defendants contend that courts use the same standard in the prison context to decide claims based on an alleged deprivation of a property interest. See Defendants' Posttrial Brief, dated May 26, 2017, at 31–32 (citing cases). Although the case law relied on by the defendants is not crystal clear on this point, it makes sense that an inmate's property based due process claim normally must be analyzed through the lens of the plaintiff's liberty based entitlements because prisoners largely forfeit the right to possess property while incarcerated and, therefore, an inmate often will not be able to allege deprivation of a "property interest" within the usual due process framework. See *Board of Regents* v. *Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972) (providing definition of "property interest" in due process analysis). A constitutionally protected "property interest" outside of prison, in other words, is often prohibited "contraband" inside prison. See Administrative Directive 6.10 (3) (B) (defining "contraband" as anything "not authorized to be . . . in an inmate's possession"). At least for doctrinal purposes, it seems sensible in this context to view the "liberty" (as opposed to the "property") component of the due process clause as the source of any limits on the state's authority to curtail an inmate's right to possess property. See also *Hudson* v. *Palmer*, 468 U.S. 517, 533, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984) (prisoner's property rights adequately protected by meaningful postdeprivation procedures under state law).

[23] The parties do not squarely address the issue in their briefing.

[24] The plaintiff's misunderstanding may have been fueled by Officer Wislocki's mistaken use of the incorrect "Publication Rejection" form on one or more occasions.

[25] The term "Little RFRA" is the colloquial name given to the statutes enacted by various states following the passage of the federal Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb et seq. According to the National Conference of State Legislatures, twenty-one states (including Connecticut) had passed such laws as of 2015. See http://www.ncsl.org/research/civil-and-criminal-justice/state-rfra-statutes.aspx (last consulted August 22, 2018).

[26] *Smith* held that the constitutionality of facially neutral laws of general application would be reviewed using the "rational basis" standard, rather than the heightened "strict scrutiny" standard, under the free exercise clause. The Connecticut legislature in the ACRF, like the federal Congress in the

[Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb et seq.], revived the applicability of the pre-*Smith* "strict scrutiny" standard. The goal of restoring the status quo ante is clear from the Connecticut statute's legislative history: "[T]o be absolutely clear, this does not—this bill does not expand, contract or alter the ability of a claimant to obtain relief in a manner consistent with the Supreme Court's free exercise jurisprudence under the compelling interest test prior to the *Smith* case." (Internal quotation marks omitted.) 36 S. Proc., Pt. 8, 1993 Sess., p. 2785, remarks of Senator George C. Jepsen, quoted in *Rweyemamu* v. *Commission on Human Rights & Opportunities*, supra, 98 Conn. App. 660–61.

[27] Section 18-81-32 of the Regulations of Connecticut State Agencies ("Incoming general correspondence") in pertinent part contains the following language, which also appears in administrative directive 10-7 (4) (G) (1), in essentially identical terms: "(a) Review, Inspection and Rejection. . . . All incoming general correspondence may be rejected if such review discloses correspondence or material(s) which would reasonably jeopardize legitimate penological interests, including, but not limited to, material(s) which contain or concern: (1) The transport of contraband in or out of the facility. . . . (10) Any other general correspondence, rejection of which is reasonably related to a legitimate penological interest." ("[c]ontraband" is defined in § 18-81-28 (b) of the Regulations of Connecticut State Agencies to mean "anything not authorized to be in an inmate's possession or anything used in an unauthorized or prohibited manner").

Section 18-81-39 ("Incoming publications and materials") contains the following language, which can also be found in administrative directive 10.7 (4) (N): "Requests for any local orders for books, magazines, newspapers, educational materials or periodicals shall be made through the school principal or other person as designated by the Unit Administrator who shall determine that the inmate is able to pay for such material(s). . . . An inmate may order hardcover books in new condition only from a publisher, book club, or book store." [Subsection] (a) of 18-81-39, "Procedures for Review of Publications and Sexually Explicit Materials," contains this general statement: "The Unit Administrator may reject a publication only if it is determined to be detrimental to the security, good order, or discipline of the facility or if it might facilitate criminal activity. The Unit Administrator may not reject a publication solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant."

———————————————